UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NOLA HEALTH SOLUTIONS, LLC | CIVIL ACTION |
| VERSUS | NO. 18-7007 |
| NEW ORLEANS REGIONAL PHYSICIAN HOSPITAL ORGANIZATION, INC., ET AL. | SECTION "R" (2) |

## **ORDER AND REASONS**

Before the Court is defendants' motion to dismiss the case under Federal Rule of Civil Procedure 12(b)(6). The Court finds that (1) plaintiff has failed to sufficiently plead that the Court has diversity jurisdiction over the action, and (2) plaintiff does not have standing to recover for injuries suffered by its principals before it was formed. The Court therefore dismisses plaintiff's claims without prejudice for lack of subject matter jurisdiction. The Court grants plaintiff leave to amend its complaint.

## I. BACKGROUND

This case arises from an alleged joint business venture to build and operate medical centers in the greater New Orleans area.[1] Plaintiff is NOLA

---
[1] R. Doc. 1.

Health Solutions, LLC, a Delaware limited liability company that was formed in July 2016 for the purposes of this business venture.[2] Defendants are (1) PH Holdings, LLC (PHH), (2) New Orleans Regional Physician Hospital Organization, d/b/a People's Health, and (3) Capital City Medical Group, LLC (CCMG).[3] CCMG and People's Health are both wholly-owned subsidiaries of PHH.[4] People's Health, the defendant most relevant to plaintiff's factual allegations, is a healthcare provider that offers its members various prepaid health plans that are primarily funded by Medicare.[5]

Plaintiff alleges that up until around 2010, People's Health did not directly or indirectly provide healthcare services to its members.[6] Around that time, People's Health allegedly began to explore the prospect of constructing and operating medical clinics in Louisiana.[7] By the middle of 2013, People's Health had constructed one medical center in the Parish of East Baton Rouge.[8] It was also allegedly close to completing and opening a medical center in Gretna, Louisiana, and had plans to construct another in

---

[2]   *Id.* at 1 ¶ 1, 20 ¶ 110.
[3]   *Id.* at 1-2 ¶¶ 2-4.
[4]   *Id.* ¶¶ 3-4.
[5]   *Id.* at 2 ¶ 5.
[6]   *Id.* at 3 ¶¶ 13-14.
[7]   *Id.* ¶ 15.
[8]   *Id.* at 3-4 ¶ 19.

2

Westwego, Louisiana.[9] Plaintiffs allege that People's Health was "way over budget" on the Gretna and Westwego projects and did not have sufficient funds to complete the planned construction.[10]

During the summer of 2013, Carol Solomon—the Chief Executive Officer (CEO) of People's Health, the Manager of CCMG, and a member of the Board of Managers of PHH[11]—was introduced to nonparty Royd Lemus while Solomon was visiting her niece in Miami, Florida.[12] Solomon's niece is the wife of nonparty Enrique Sanchez.[13] Lemus and Sanchez are both in the construction business.[14] In 2013, Lemus also allegedly owned and operated a P.E.T.-C.T. and M.R.I. scanning and diagnostic center.[15] Solomon explained to Lemus and Sanchez People's Health's efforts to build new medical centers in Louisiana and allegedly stated that People's Health was in the process of partnering with parties who could operate the newly constructed clinics.[16] Plaintiff contends that after this initial meeting,

---

9     *Id.* at 4 ¶ 20.
10    *Id.* ¶ 22.
11    *Id.* at 2 ¶ 11.
12    *Id.* at 4 ¶ 25.
13    *Id.*
14    *Id.*
15    *Id.*
16    *Id.* at 4-5 ¶ 26.

Lemus, Sanchez, and Solomon began to discuss potential business opportunities.[17]

Plaintiff alleges these discussions began to become more definite in the beginning of 2014.[18] In March 2014, Solomon allegedly proposed an arrangement whereby Lemus and Sanchez would manage and supervise the construction of the Westwego medical center for no charge and would be reimbursed for their out-of-pocket expenses.[19] In exchange, Lemus and Sanchez would be given the right to operate both medical centers under provider agreements with People's Health.[20] Plaintiff alleges that People's Health's anticipated savings from this arrangement was $2.3 million.[21] At the center of these discussions were the terms of the provider agreements. Solomon allegedly represented to Lemus and Sanchez that in order for the arrangement to be worthwhile to People's Health, the provider agreements had to include a specific compensation formula.[22] Lemus and Sanchez say they were "enthused" by Solomon's proposal and began to look for an

---

[17] *Id.* at 5-6 ¶ 30.
[18] *Id.* at 6-9.
[19] *Id.* at 8-9 ¶ 46.
[20] *Id.*
[21] *Id.*
[22] *Id.* at 8 ¶ 44. Solomon's proposed compensation formula called for People's Health to pay the medical centers $75 per month for each assigned member and 85% of the premium paid by Medicare to People's Health. *Id.*

apartment in New Orleans where they could live while supervising the construction of the Westwego medical center.[23]

Plaintiff asserts that Lemus and Sanchez began the construction process later in the spring of 2014.[24] They created St. John Consulting, LLC, a Florida limited liability company, as the vehicle by which they would manage and supervise the construction.[25] They also allegedly recruited Dr. Sonia Michael to be their third partner in the project.[26] It was not until September 2014 that the parties signed an agreement for the services Lemus, Sanchez, and Michael would provide defendants.[27] Under the alleged terms of the agreement, St. John Consulting would receive a monthly fee of $5,000 in exchange for performing "a number of functions to assist CCMG with the development and implementation of a comprehensive business strategy for its Primary Care Plus medical clinics."[28] The $5,000 monthly consulting fee was allegedly the amount Solomon had determined would adequately compensate Lemus and Sanchez for their out-of-pocket costs while managing and supervising the construction efforts.[29] Plaintiff alleges that

---

[23]  *Id.* at 9 ¶¶ 48-49.
[24]  *Id.* at 10-11.
[25]  *Id.* at 10 ¶ 55.
[26]  *Id.* at 11 ¶ 58.
[27]  *Id.* at 14 ¶ 72, 16 ¶ 79.
[28]  *Id.* at 14 ¶ 72.
[29]  *Id.* ¶ 74.

Solomon also told Lemus and Sanchez that she had proposed to the boards of PHH and People's Health the compensation formula that they had discussed for the eventual provider agreements.[30] Plaintiff asserts that Solomon stated that the boards had approved the formula.[31]

Plaintiff alleges that starting in October 2014, Lemus and Sanchez concentrated all their time and energy on the construction of the Westwego medical center, to the detriment of their other business interests in Miami, Florida.[32] Plaintiff also alleges that during construction, Lemus and Sanchez pressed People's Health to memorialize their agreement regarding operating the medical centers.[33] In June 2015, Lemus and Sanchez hired attorneys to advise them during contract negotiations.[34] Their attorneys drafted a term sheet that Lemus and Sanchez presented to defendants.[35] On August 14, 2015, Lemus and Sanchez allegedly completed construction of the medical center.[36] But the parties still had not entered into a formal agreement governing the operation of the Westwego and Gretna centers. It was not until June 2016 that Solomon allegedly informed Lemus and Sanchez that

---

30   *Id.* at 15-16 ¶ 78.
31   *Id.*
32   *Id.* at 16 ¶¶ 80-81.
33   *Id.* at 16-17.
34   *Id.* at 17 ¶ 90.
35   *Id.* at 18 ¶ 92.
36   *Id.* ¶ 93.

People's Health's attorney had "signed off," and that People's Health would send them a revised version of the term sheet Lemus and Sanchez had proposed the year before.[37] On July 13, 2016, in apparent anticipation of formalizing the agreement to operate the medical centers, Lemus and Sanchez formed plaintiff NOLA Health Solutions, LLC.[38]

Plaintiff alleges that the term sheet People's Health presented to Lemus and Sanchez "materially altered terms that had been previously agreed to."[39] According to plaintiff, the term sheet did not include the formal terms to be included in the ultimate provider agreements, let alone the compensation formula Solomon had said was approved by defendants' boards.[40] It instead simply stated that the parties "will enter into a provider agreement for the provision of services to the Medicare Advantage population of People's Health."[41] The term sheet also contained "Good Faith/Confidentiality" and "Exclusive Negotiations" provisions.[42] The Exclusive Negotiation provision stated that neither side was permitted to

---

[37] *Id.* at 20 ¶ 108.
[38] *Id.* ¶ 110.
[39] *Id.* at 20-21 ¶ 114.
[40] *Id.*
[41] *Id.* at 21 ¶ 115; R. Doc. 1-12 at 2.
[42] R. Doc. 1 at 21 ¶ 117; R. Doc. 1-12 at 4.

7

discuss the development or operation of medical clinics in Westwego or Gretna for 90 days following the execution of the term sheet.[43]

On August 1, 2016, Lemus and Sanchez, through plaintiff, executed the term sheet with CCMG and People's Health.[44] Plaintiff alleges that it signed the term sheet expecting People's Health to be willing to enter into provider agreements for both medical centers that contained the compensation formula Solomon previously proposed.[45] On December 1, 2016, People's Health allegedly sent plaintiff a draft provider agreement that did not contain the promised compensation formula.[46] On that same day, Solomon suffered a massive stroke and passed away.[47]

On January 5, 2017, defendants, through their attorney, informed plaintiff that defendants intended to terminate the term sheet because the 90-day exclusivity period had expired.[48] Plaintiff alleges that after discussions between defendants' attorney and plaintiff, defendants agreed to "consider closing" with plaintiff if plaintiff could show that it could "meet its obligations under the Term Sheet."[49] Because the provider agreements did

---

[43] R. Doc. 1-12 at 4-5.
[44] R. Doc. 1 at 21 ¶ 118.
[45] *Id.*
[46] *Id.* ¶¶ 122-23.
[47] *Id.* ¶ 124.
[48] *Id.* ¶ 126.
[49] *Id.* at 23 ¶ 130.

not contain the compensation formula Solomon had proposed, plaintiff concluded that defendants' offer was "too risky" and a "recipe for failure."[50] On February 1, 2017, defendants' attorney allegedly informed plaintiff that defendants' boards had decided to terminate the term sheet.[51] Plaintiff alleges that shortly after the termination, it learned of a press release, dated December 1, 2016, announcing that People's Health had entered into a provider agreement with nonparty JenCare Senior Medical Center.[52] According to plaintiff, the press release stated that the agreement was for the provision of healthcare serves to People's Health members at JenCare's four medical centers in the greater New Orleans area, including its medical center in Gretna.[53]

On July 26, 2018, plaintiff filed this lawsuit in federal court against defendants.[54] Plaintiff alleges that the Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties.[55] Plaintiff's complaint includes claims for (1) fraud in the inducement, (2) fraud, (3) unjust enrichment, (4) detrimental

---

[50] *Id.* ¶ 132.
[51] *Id.* at 23-24 ¶ 133.
[52] *Id.* at 24 ¶¶ 137-38.
[53] *Id.* ¶ 138.
[54] *See id.*
[55] *Id.* at 2 ¶ 8.

reliance, (5) breach of fiduciary duty, and (6) breach of the term sheet's good faith and exclusive negotiations provisions.[56] Defendants now move to dismiss all of these causes of action, on the grounds that (1) plaintiff's fraud and detrimental reliance claims were prescribed, and (2) for each cause of action plaintiff failed to state a claim upon which relief can be granted.[57] Defendants did not raise any arguments regarding whether the Court has jurisdiction over the action, or whether plaintiff has standing to assert all of its claims.

## II.  LEGAL STANDARD

Federal courts are courts of limited jurisdiction and possess power over only those cases authorized by the United States Constitution and federal statutes. *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996). Two possibilities for jurisdiction exist: federal question jurisdiction under 28 U.S.C. § 1331, and diversity jurisdiction under 28 U.S.C. § 1332. Diversity jurisdiction exists only when there is complete diversity of citizenship, and the amount in controversy exceeds $75,000, exclusive of interests and costs. 28 U.S.C. § 1332(a).

---

[56]  *Id.* at 25-47.
[57]  R. Doc. 14.

If a district court lacks jurisdiction over the subject matter of a plaintiff's claims, it must dismiss the case. *See* Fed. R. Civ. P. 12(b)(1). The lack of subject matter jurisdiction may be raised at any time during the pendency of the case by any party or by the court. *See Kontrick v. Ryan*, 540 U.S. 443, 456 (2004) ("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."); *McDonal v. Abbott Labs.*, 408 F.3d 177, 182 n.5 (5th Cir. 2005) ("[A]ny federal court may raise subject matter jurisdiction *sua sponte*."). "The citizenship of a party at the *commencement* of the action is controlling for purposes of determining diversity jurisdiction and subsequent actions do not affect the court's jurisdiction." *Aetna Cas. & Sur. Co. v. Hillman*, 796 F.2d 770, 776 (5th Cir. 1986) (citing *Oliney v. Gardner*, 771 F.2d 856, 858 (5th Cir. 1985)) (emphasis in original).

### III. DISCUSSION

#### A. Diversity of Citizenship

For the purposes of determining diversity jurisdiction, a limited liability company's citizenship is determined by the citizenship of all its members. *Harvey v. Grey World Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). Because plaintiff is the party invoking the Court's diversity

11

jurisdiction, it has the burden of proving that complete diversity exists. *Getty Oil Corp., a Div. of Texaco, Inc. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988). Plaintiff's pleading must comply with Federal Rule of Civil Procedure 8(a)(1), which requires that the complaint include "a short and plain statement of the grounds for the court's jurisdiction. . . ." The Fifth Circuit has "stated repeatedly that when jurisdiction depends on citizenship, citizenship must be '*distinctly and affirmatively* alleged.'" *Getty Oil Corp.*, 841 F.2d at 1259 (emphasis in original); *see also Ill. Cent. Gulf. R. Co. v. Pargas, Inc.*, 706 F.2d 633, 636 (5th Cir. 1983) (noting that the basis for jurisdiction cannot be established argumentatively or by mere inference).

Plaintiff is therefore obligated to state affirmatively in its complaint the citizenship of each member of the LLCs on both sides of this action. *See Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 397-98 (5th Cir. 2009); *Fowler Rodriguez Valdes-Fauli, LLP v. Medford*, No. 11-618, 2011 WL 6258493, at *1 (E.D. La. Dec. 15, 2011) (finding that plaintiff did not adequately allege that the court had diversity jurisdiction because it did not "allege the citizenship of the members of the limited liability companies on both sides of the case"). Plaintiff alleges that three of the parties in this action are LLCs: 1) plaintiff; 2) defendant PH Holdings; and 3) defendant CCMG.[58]

---

[58] R. Doc. 1 at 1-2 ¶¶ 1-2, 4.

12

Plaintiff does not distinctly and affirmatively identify the members of these LLCs, let alone the members' citizenship. Without this information the Court cannot determine whether diversity jurisdiction exists. This failure thus requires the Court to dismiss the complaint. *See Getty Oil Corp.*, 841 F.2d at 1259.

B.  **Article III Standing**

Plaintiff's complaint contains a separate jurisdictional issue: plaintiff's standing to bring all of its allegations. The Court finds that plaintiff does not have standing to recover for two of its alleged injuries because those injuries were suffered by Lemus and Sanchez before plaintiff was formed.

In any suit in federal court, the issue of standing presents a "threshold jurisdictional question." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The requirement that a party have standing to sue flows from Article III of the Constitution, which limits the scope of the federal judicial power to the adjudication of "cases" or "controversies." U.S. Const. art. III, § 2. Standing consists of three elements: (1) the plaintiff must have suffered an "injury-in-fact," which is an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent"; (2) the injury must be "fairly traceable" to the challenged conduct of the defendant; and (3) it must be likely that plaintiff's injury will be redressed by a favorable judicial

13

decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  As with the determination of whether the Court has diversity jurisdiction, the Court must, when necessary, raise the issue of plaintiff's Article III standing *sua sponte*.  *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331-32 (5th Cir. 2002).

As the party invoking federal jurisdiction, plaintiff bears the burden of establishing each element of standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("[A]t the pleading stage, the plaintiff must clearly allege facts demonstrating each element." (internal quotation omitted)).  To carry this burden, the plaintiff must support each element with the "manner and degree of evidence required at the successive stages of litigation."  *Lujan*, 504 U.S. at 561.  Because this action is at the motion to dismiss stage, plaintiff must therefore support its contention that it has Article III standing commensurate with the pleading standard set by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007).  Under this standard, plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (internal quotation omitted); *Spokeo*, 136 S. Ct. at 1547.

Here, the complaint contains six different causes of action: fraud in the inducement, fraud, unjust enrichment, detrimental reliance, breach of

fiduciary duty, and breach of contract.[59] To support its standing to bring these various claims, plaintiff alleges it has suffered four different injuries: (1) working for and providing consulting and other services to defendants for free, which plaintiff values as worth $2.3 million;[60] (2) incurring out-of-pocket costs exceeding the monthly reimbursements defendants provided;[61] (3) not being provided the promised takeover of the operations of the Westwego and Gretna medical centers;[62] and (4) paying substantial fees to its consultants, in particular the consultants who prepared its business plan. Any one of these alleged injuries could serve as the basis for plaintiff's Article III standing, provided the courts recognize the cause of action plaintiff asserts. *See Vanderbilt Mortg. & Fin., Inc. v. Flores*, 692 F.3d 358, 370 (5th Cir. 2012) ("Generally, there is standing once a plaintiff has suffered a legally cognizable injury or wrong for which the law provides a cause of action to seek redress."). Whether plaintiff can in fact recover under a cause of action for its legally cognizable injury is a merits question that does not implicate Article III. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) ("Whether recovery for [plaintiff's] claim is permitted under governing law

---

[59] *Id.* at 25-47.
[60] *Id.* at 33 ¶ 170; 35 ¶ 177; 37 ¶¶ 184-85; 39 ¶¶ 194-96; 43 ¶ 214; 46 ¶ 227.
[61] *Id.* at 33 ¶ 170; 35 ¶ 177; 43 ¶ 214; 46 ¶ 227.
[62] *Id.* at 33 ¶ 170; 35 ¶ 177; 39 ¶ 192; 43 ¶ 214; 46 ¶ 227.

is a separate question; it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered.").

The third and fourth alleged injuries listed above—that plaintiff was not granted the promised takeover of the Westwego and Gretna medical centers, and that defendants' misrepresentations caused it to pay substantial fees to its consultants—are legally cognizable injuries that can support plaintiff's Article III standing. Plaintiff alleges that it sustained these injuries as a result of defendants' alleged actions.[63] Because plaintiff has not adequately alleged that the Court has diversity jurisdiction over this action, the Court will not address the merits of defendants' motion to dismiss. But the Court notes that it is questionable whether plaintiff may recover the value of the promised takeover of the medical centers under any of its tort claims. *See McGee v. A C & S, Inc.*, 933 So. 2d 770, 773-74 (noting that La. C.C. art. 2315 authorizes compensatory damages for tort victims, which are "designed to place the plaintiff in the position in which he would have been if the tort had not been committed" (internal quotation omitted)).

---

[63] *See id.* at 3 ¶ 12 (alleging that Lemus, Sanchez, and Michael had the intention of forming plaintiff to operate the medical centers); *id.* at 23 ¶ 132 (alleging that in January 2017, six months after plaintiff was formed, plaintiff's consultant evaluated defendants' proposed provider agreement and prepared an updated business plan).

But the first two injuries listed above—that Lemus and Sanchez worked for and provided consulting and other services to defendants for free, and that Lemus and Sanchez incurred out-of-pocket expenses exceeding their reimbursements—are not injuries that plaintiff itself suffered. The first injury is the alleged value Lemus and Sanchez conferred upon defendants for free by constructing the Westwego medical center.[64] The second injury is the amount Lemus and Sanchez allegedly lost on out-of-pocket expenses during construction.[65] These two injuries, as alleged, were thus sustained during, or as a direct result of, construction of the Westwego medical center, which was completed nearly one year before plaintiff was formed.[66] Plaintiff does not allege that its principals provided defendants with any services, or incurred any out-of-pocket expenses, after it was formed in July 2016.[67] According to the allegations in the complaint, these injuries were therefore sustained by Lemus and Sanchez only, and plaintiff does not have Article III standing to recover for them under any legal theory. *See Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319-20 (5th Cir. 2002) (plaintiff had no standing

---

[64] *Id.* at 16-18.
[65] *Id.* at 14 ¶ 76 (explaining that Lemus and Sanchez's monthly reimbursements from defendants were intended to cover their out-of-pocket costs while constructing the medical center).
[66] *Id.* at 18 ¶ 93; 20 ¶ 110.
[67] *Id.* at 20-24.

17

to sue for injuries to nonparties); *Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78, 85 (D.D.C. 2008) (plaintiff non-profit corporation did not have standing to sue with respect to "events and injuries" that occurred while its articles of incorporation were revoked because it did not legally exist, but did have standing with respect to injuries it sustained after reinstatement); *see also Kiryas Joel Alliance v. Vill. of Kiryas Joel*, No. 11-3982, 2011 WL 5995075, at *7-8 (S.D.N.Y. Nov. 29, 2011) (plaintiff organization did not have standing to assert claims based on injuries to its nonparty members).

Because the injury-in-fact requirement is an issue of constitutional standing, whether plaintiff has standing to sue under applicable state law is of no relevance. *Int'l Primate Prot. League v. Admins. of the Tulane Educ. Fund*, 895 F.2d 1056, 1061 (5th Cir. 1990) (citing *Phillips Petroleum v. Shotts*, 472 U.S. 797, 804 (1985)), *rev'd on other grounds*, 500 U.S. 72 (1991); *see also* Wright & Miller, 13B *Federal Practice and Procedure* § 3531.14 (3d ed. 2018) ("Of course state rules that recognize standing need not be honored if Article III requirements are not met.").

But even if it did apply, the state law applicable to plaintiff's complaint does not grant plaintiff standing to recover for injuries sustained by its principals before it was formed. Under Federal Rule of Civil Procedure 17, a corporation's capacity to assert a claim "is determined . . . by the law under

18

which it was organized." Fed. R. Civ. P. 17(b)(2). Because plaintiff was incorporated in Delaware,[68] Delaware law therefore applies. Under Delaware law, an LLC is the proper plaintiff in a suit against a defendant whose actions injure the LLC's individual members as a result of their interest in the company. *See Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 887 (Del. Ch. 2009) (citing 6 Del. C. § 18-1001). Under this rule, a member of an LLC can bring direct claims against a defendant only when "the member has suffered damage that is independent of any damage suffered by" the LLC. *Id.* But when—as is the case here—the LLC's principals suffer their injuries *before* the LLC comes into existence, those injuries are plainly independent of damage to the LLC, and must be asserted by the individual members directly. *See id.*; *cf. Baier v. Upper N.Y. Inv. Co., LLC*, No. 6896, 2018 WL 1791996, at *9 (Del. Ch. Apr. 16, 2018) (in a tort action, no personal jurisdiction over Delaware LLC under Delaware's implied consent statute when the individual who controlled the LLC commenced and completed an alleged fraudulent scheme prior to the existence of the LLC).

In all, plaintiff fails to allege that it suffered any injuries in connection with Lemus's and Sanchez's (1) working for and providing consulting and other services to defendants for free, which plaintiff values as worth $2.3

---

[68] *Id.* at 1 ¶ 1.

million;[69] and (2) incurring out-of-pocket costs exceeding the monthly reimbursements defendants provided.[70] Under any cause of action, plaintiff therefore does not have standing to recover for these alleged injuries.

## IV. CONCLUSION

For the reasons stated above, plaintiff has failed to allege that the Court has diversity jurisdiction over this action, or that plaintiff has standing to recover for all of its asserted injuries. Plaintiff's complaint is therefore DISMISSED WITHOUT PREJUDICE. Plaintiff has 21 days to amend its complaint.

New Orleans, Louisiana, this __4th__ day of January, 2019.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[69] *Id.* at 33 ¶ 170; 35 ¶ 177; 37 ¶¶ 184-85; 39 ¶¶ 194-96; 43 ¶ 214; 46 ¶ 227.
[70] *Id.* at 33 ¶ 170; 35 ¶ 177; 43 ¶ 214; 46 ¶ 227.